IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CIVIL ACTION NO.
1:13-CR-00394-AT-LTW

MICHAEL J. VARNELL,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND  RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is presently before the Court on Michael John Varnell's ("Defendant") Motion to Suppress Statements.  (Docket Entry [13]).  For the reasons outlined below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**.  (Docket Entry [13]).

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant argues in his Motion to Suppress Statements that federal agents executing a search warrant at his residence placed him in custody and unlawfully questioned him without giving him <u>Miranda</u> warnings.  Defendant also contends that the statements he made during his interrogation were involuntary.

## I.    FACTUAL BACKGROUND

On February 27, 2013, Special Agent Anthony Scott ("Scott") of the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI),

served as the case agent in a child pornography investigation in which Defendant was a subject. (Transcript of March 31, 2014 Evidentiary Hrg., Docket Entry [25], hereinafter "Tr.," at 4).  Between 6:00 a.m. and 7:00 a.m. on February 27, 2013, Scott and a team of approximately ten agents from DHS, two Cobb County police officers, and a seized property specialist, executed a federal search warrant at the Defendant's residence, 1688 Cedar Bluff Way in Marietta, Georgia.  (Tr. 4, 5, 37).  Special Agent David Westall ("Westall") and Special Agent Jeff Robeson ("Robeson") from HSI were among the federal agents executing the search warrant.  (Tr. 5-6,14, 18, 35, 37).  Scott approached the door, knocked, identified himself and those accompanying him as federal agents, and announced that they possessed a warrant to search the residence. (Tr. 6).  The federal agents were dressed in tactical gear including shirts or jackets indicating that they were federal agents, and at the time they approached the residence, they had their weapons drawn.  (Tr. 6, 14).  Defendant's stepfather opened the door. (Tr. 6, 7, 37-38).  The agents, with their guns drawn, entered the home and proceeded to secure the premises by clearing the upstairs and downstairs areas and identifying all those within the residence.  (Tr. 6, 7, 14).  At the time, only Defendant, his step-father, and his mother were present in the home.  (Tr. 8, 15, 38).  After clearing the home, the federal agents re-holstered their weapons.  (Tr. 19).

The agents escorted the three occupants of the home downstairs to the living room.  (Tr. 8).  There, the agents informed the occupants that someone in the home was believed to be engaged in trading child pornography.  (Tr. 9).  Scott showed Defendant's

2

stepfather and mother the search warrant. (Tr. 15). All three occupants were cooperative. (Tr. 20, 38). The agents credibly testified that none of the occupants were handcuffed or otherwise physically restrained at any time during the search. (Tr. 7, 8, 19). The agents did not use force or make threats toward the occupants during the search. (Tr. 9, 19, 20).

Approximately ten minutes after entering the home, Westall approached Defendant and asked to speak with him. (Tr. 20). Westall testified that he selected Defendant because "he seemed more likely to be the person involved in the crime [they] were there for." (Tr. 20, 38). Defendant agreed to speak with the agents. (Tr. 39). Westall asked Defendant where would he prefer to speak, and Defendant stated that he would be "most comfortable" in his bedroom. (Tr. 39). Defendant directed the agents to his bedroom. (Tr. 21, 38-40). Upon entering the room, Westall stood next to a set of nun-chucks on the wall next to the closet, Defendant sat in a desk chair in the middle of the room, and Robeson sat on Defendant's bed. (Tr. 21, 40-41). Robeson recalls that the agents closed the door to avoid distraction from other agents conducting the search of the home. (Tr. 21). The door remained unlocked and was not blocked. (Tr. 21, 41). Westall recalled that the room was "in a state of disarray" with "multiple holes in the walls [and] broken things [scattered] around." (Tr. 40). Additionally, Westall noticed that a packaged Hot Wheels car, a Michael Jordan plaque, posters, and Star Wars memorabilia were all hung on the walls. (Gov't Ex. 5-8). The words "suck it" were written above a window in the room. (Gov't Ex. 5). Robeson stated that based upon

3

the condition of the room, he would not have placed Defendant's age at twenty-nine years. (Tr. 32).

The agents credibly testified that while they were inside the bedroom with Defendant, they did not promise him anything, threaten him, use force against him, or restrain him. (Tr. 41-42). The agents recorded the interview. (Tr. 23). As the recording starts, Defendant can be heard talking and using expletives while Robeson announced the participants in the interview. (Tr. 32-33, Gov't's Ex. 10). The agents explained that they obtained a search warrant to search the home because they had received information that an IP address associated with the home was being used to send child pornography to others. (Tr. 22). Robeson offered to show Defendant the search warrant but Defendant declined to look at it. (Tr. 22; Gov't's Ex. 10 at 00:50). Defendant remarked that he has been diagnosed with "nausea-induced anxiety," meaning that his "terrible" anxiety causes him to be extremely nauseated. (Tr. 24, 28; Gov't's Ex. 10 at 1:39-1:55).

During the interview, an agent informed Defendant that he was not under arrest, that his parents were not under arrest, that nobody was going to jail that day, and that no one would be forced to do anything that they did not want to do. (Tr. 33; Gov't's Ex. 10). Defendant responded that "everyone always says that stuff but you wind up being arrested for something (inaudible)." (Gov't's Ex. 10 at 2:10). The agent also told Defendant that he was free to leave, and that he could walk out and "walk down the road" if he wanted to do so. (Gov't's Ex. 10 at 2:18). The agent advised Defendant that

4

at any time, he could just say, I want to leave the house.  (Gov't's Ex. 10 at 2:19) Defendant responded that he could not do that, and he did not want to leave the house. (Gov't's Ex. 10 at 2:27).  The agent said, "just as long as you know," and Defendant again responded that he has no choice but to talk.  (Gov't's Ex. 10 at 3:08).  About eight minutes into the interview, the agent again told Defendant, "You don't have to talk to us. You can leave."  (Gov't's Ex. 10).  Defendant interjected, "Yes I do."  (Gov't's Ex. 10).  The agent responded, "I'm just telling you, you don't.  You can walk out.  You can leave."  (Gov't's Ex. 10 at 2:08).  Throughout the interview, the agent repeatedly told Defendant that he did not have to talk to them and that he could leave.  (Gov't's Ex. 10 at 8:00, 27:45, 31:51, 31:56).

During the course of the interview, Defendant admitted that the email account the agents were investigating was his account, that he had an interest in young children ages six and up, and that he knew child pornography was illegal.  (Tr. 22, 25, 44; Gov't's Ex. 10).  Defendant stated that he had gone "nutso" from not having a job, and had been suffering from anxiety for seven years.  (Gov't's Ex. 10 at 6:12).  Defendant admitted that he had an interest in viewing nude photos of "under-aged" and "illegal" girls ages six and older.  (Tr. 25; Gov't's Ex. 10 at 11:21-47).  Defendant provided the agents with the sites, search terms, and processes he used to obtain the nude photos.  (See generally Gov't's Ex. 10).

At one point, agents asked Defendant for permission to "assume his identity." (Gov't's Ex. 10 at 9:00).  Defendant did not initially understand what agents meant by

the term "assume."  (Tr. 29-30, 46; Gov't's Ex. 10 at 9:00.).  The agents, however, clarified their request by advising Defendant that they wanted to use his email account, and Defendant provided the information needed to access his email account.  (Tr. 46, Gov't's Ex. 10 at 9:08, 16:50).

When the agents asked Defendant if he would submit to a polygraph test, Defendant answered that he would do so if the test could be conducted at his home.  (Gov't's Ex. 10 at 26:56).  Defendant remarked that because of his anxiety, he could not go to an office to complete the polygraph test, but he was willing to take a polygraph test at home.  (Gov't's Ex. 10 at 27:03).  Defendant stated that he had "the worst anxiety, and could not leave [his home] without getting nauseous."  (Gov't's Ex. 10).  According to Defendant, he had not left his home in a very long time, and he stayed in his room all day and played games.  (Tr. 30-31, 48; Gov't's Ex. 10).  When Defendant was asked if he wanted to leave, Defendant responded in the negative, indicating that he did not want to leave; and that he wanted to stay in his house.  (Gov't's Ex. 10).  Defendant explained that he did not have a job because he suffered from the "worst" anxiety, that leaving the house made him nauseated, and that he gets violently sick.  (Gov't's Ex. 10).  Defendant was again asked, "Do you still want to talk to us?"  (Gov't's Ex. 10).  Defendant responded that he did not have a choice.  (Gov't's Ex. 10).  The agents again explained to Defendant that he had a choice [not to talk] and could leave.  (Gov't's Ex. 10).  The agents told Defendant that if he could not leave the house due to anxiety, he could go somewhere [else].  (Gov't's Ex. 10).

Approximately thirty-one minutes into the conversation, the agents told Defendant that they appreciated him talking with them. (Gov't's Ex. 10 ). Defendant responded again, "Yeah, I've got no choice." (Gov't's Ex. 10 ). The agent responded, "You keep saying that, but I keep telling you that you do. Like I said, you don't have to talk to us." (Gov't's Ex. 10). Defendant responded, "Well, I do though . . . I understand how stuff works." (Gov't's Ex. 10).

When Defendant asked if he was going to jail, one of the agents remarked that no one in the home would be arrested that day. (Tr. 31; Gov't's Ex. 10). Defendant asked the agents what was likely to happen next based on their experiences. (Tr. 31, 47; Gov't's Ex. 10 at 32:19). Defendant told the agents not to lie to him because he has the "worst anxiety." (Gov't's Ex. 10). The agents explained to Defendant that they act as "fact finders" to gather all the evidence and present it to the United States Attorney's Office (USAO) and that the USAO would ultimately decide whether to prosecute Defendant. (Tr. 31, 47; Gov't's Ex. 10 at 32:30-32:50, 33:29-39). The agents informed Defendant again that he would not be arrested on that day and that they were just there to collect evidence. (Gov't's Ex. 10, at 32:53). Defendant asked the agents what his chances were. (Gov't's Ex. 10). The agents told Defendant that the most important thing he could do was cooperate. (Gov't's Ex. 10). Defendant responded that he did not want to go to jail for pictures. (Gov't's Ex. 10). The agents did not tell Defendant that he could be charged with possession of child pornography or that his statements could be used against him. (Tr. 31, 48). The agents did not advise Defendant of his <u>Miranda</u>

7

rights.  (Tr. 43).

Robeson testified that Defendant was calm at times, upset at other times, and appeared to be "very, very nervous."  (Tr. 24).  Defendant, however, appeared to be stuttering on multiple occasions during the interview.  (Tr. 29; see generally Gov't's Ex. 10).  The agents credibly testified that Defendant appeared capable of understanding and answering questions without difficulty.  (Tr. 44; see generally Gov't's Ex. 10). Additionally, the tone of the interview remained conversational throughout.  (Tr. 45; See generally Gov't's Ex. 10).  Although the recording of the interview lasted for approximately thirty-five minutes, Defendant never asked to stop the interview.  (Tr. 24; Gov't's Ex. 10).  After Robeson decided to conclude the interview, all three men walked downstairs and Defendant returned to the living room.  (Tr. 27).  While downstairs, Robeson overheard Defendant tell his mother that he "couldn't help the fact that he was interested in undeveloped girls."  (Tr. 33).

On September 25, 2013, a federal grand jury charged Defendant with distribution, receipt, and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(2), 2252(b), 2252(a)(4)(b), and 2252(b)(2).  (Docket Entry [1]).  On November 26, 2013, Defendant moved to suppress the statements he made to Westall and Robeson during the execution of the search warrant.  (Docket Entry [13]).  An evidentiary hearing was held on Defendant's Motion to Suppress on March 31, 2014. (Docket Entry [26]). Defendant submitted a post-hearing brief on May 2, 2014. (Docket Entry [28]).  The Government filed a response to Defendant's post-hearing brief on June 9, 2014 (Docket

Entry [32]), and Defendant was given to July 7, 2014, to file a reply.  (Docket Entry [34]).  The Court was notified on July 7, 2014, that Defendant would not be filing a reply brief.  Accordingly, this matter is now ripe for a ruling.

## II.   **LEGAL ANALYSIS**

Defendant argues the statements he made to federal agents should be suppressed because the agents did not read him his Miranda rights prior to making them even though he was effectively in custody at the time the statements were made.  In support, Defendant points out that numerous armed agents arrived at his home early in the morning to execute a search warrant, and within minutes of their arrival, two agents were questioning him in his bedroom with the door closed while his mother and stepfather remained downstairs and agents searched the residence.  Defendant contends that under the circumstances, no reasonable person would feel that he could leave. Defendant argues that because he was in custody, the agents should have read him his Miranda warnings.

In response to Defendant's arguments, the Government contends that the agents were not required to provide Miranda rights to Defendant because Defendant was not in custody during the interview.  The Government also argues Defendant was not in custody because he was repeatedly informed of his right to refuse or stop the interview; Defendant was interviewed in his own bedroom, a plainly familiar environment that he chose; and Defendant was not physically harmed, restrained, or threatened.

9

### A.   Defendant Was Not in Custody for Purposes of Miranda

Having read and considered the arguments provided by both parties, and having heard the tape recorded interview of Defendant, the undersigned finds Defendant was not entitled to Miranda warnings because he was not in custody when he voluntarily provided statements to law enforcement agents.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations.  Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress' attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).

The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  To determine whether a suspect is in custody, and thus entitled to a reading of his Miranda rights, a Court considers the totality of the circumstances surrounding the interrogation and whether, given those circumstances, a reasonable person in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave.  J.D.B. v. North

AO 72A
(Rev.8/82)

Carolina, –U.S.–, 131 S. Ct. 2394, 2402 (2011); United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006); United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (holding that absent a formal arrest, a court can only conclude that a suspect is in custody when, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave."). The test is objective; neither the suspect's nor the officer's actual, subjective view is relevant. Peoples v. Campbell, 377 F.3d 1208, 1228-29 (11th Cir. 2004). The court looks to the perspective of a "reasonable innocent person" when making this determination. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). In considering the totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome determinative—[the court] simply weigh[s] the totality of the circumstances." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Brown, 441 F.3d at 1349). Circumstances to be considered include whether and how the officers brandished weapons, touched the suspect, or used language or tone that indicated that compliance with the officers could be compelled, as well as the location and duration of the search. United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)). Additionally, whether law enforcement officers advised the suspect that he is not under arrest is of "substantial importance in determining whether a reasonable person would have felt free to leave."

11

Muegge, 225 F.3d at 1271; see also Peoples, 377 F.3d at 1228-29.  Furthermore, in Muegge, the Eleventh Circuit held that a suspect who is "unambiguously advised" that he is free to go, is, in the absence of evidence to the contrary, not in custody.  Muegge, 225 F.3d at 1271.  An exception occurs where "the restraints . . . are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"  Id.

Regarding an in-home questioning, courts within the Eleventh Circuit are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (quoting Brown, 441 F.3d at 1348); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (holding that ". . . interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); United States v. Cerreta, 63 F. App'x 585, 587 (2d Cir. 2003) (opining that an interview conducted in a bedroom during which the door was closed but unlocked and unblocked does not constitute custodial interrogation).

Applying the law to the facts of this case, the Court concludes that the agents were not required to read Miranda rights to Defendant because he was not in custody when the agents questioned him.  First, during the interview, the agents did not threaten Defendant, use handcuffs or otherwise restrain him, draw their weapons, or force him to speak with them.  The record does not reflect that Defendant's person was searched or patted down, or that he was asked to remove any items from his possession at any

time.  Further, the tone of the interview was conversational rather than accusatory.  In addition, the agents explicitly informed Defendant on multiple occasions that he was not under arrest, that he was under no obligation to speak with them, and that he could leave the interview or refuse to answer questions at any time.  Defendant chose to continue to engage in the conversation, despite being informed by the agents, unambiguously, that he did not have to speak with them.  Second, agents asked to speak with Defendant while he was in the presence of his mother and stepfather, and Defendant chose his bedroom, a place familiar to him, as the location for the interview.  Although the bedroom door was closed, the door remained unlocked and unblocked.  Defendant was repeatedly told he did not have to speak to the agents and that he could leave if he liked.  Third, the duration of the interview was only approximately thirty-five minutes.

Defendant also argues that when he told the agents that he stayed in his room all the time, and that he suffered from bouts of anxiety, the agents should have been alerted to his mental limitations.  The inquiry into whether Defendant was in custody, however, is analyzed from an objective point of view, such that Defendant's particular beliefs about his freedom to leave such as those stemming from his nervousness, anxiety, or fear, are not relevant to the inquiry.  Muegge, 225 F.3d at 1270 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.");  Moya, 74 F.3d at 119 ("[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.").  Thus, under the circumstances of this case, especially given the agents' explicit and

13

repeated statements that Defendant was not under arrest and could leave, a reasonable person would have felt free to leave his bedroom and end the interview. For these reasons, the agents did not place Defendant in custody and they were not required to read Defendant his <u>Miranda</u> warnings.

### B.   <u>Defendant's Statements to Agents Were Voluntary</u>

Defendant contends that the statements he made to the agents were not the product of a free and rational choice. To support this contention, Defendant alleges his will was overborne by the law enforcement officers because multiple armed agents were in his home during the questioning, he was separated from his mother and stepfather, and he was left alone in the bedroom with the agents while he was in a mentally weakened state. Defendant further contends that the agents should have known that he was in a mentally weakened state, possessed a compromised intellect, and lacked education because (1) his bedroom was in disarray, had holes in the wall, and contained toys on display; (2) he stuttered throughout the interview; (3) he referred to going "nutso" over the last few years; (4) he was upset to the point that he felt physically ill; (5) agents had to repeatedly tell him to relax; (6) he clearly did not understand the agents' request that he allow them to assume his email identity; and (7) he kept repeating that he had to talk to the agents despite the agents' assurances to the contrary. Defendant also asserts that when he asked the agents what was going to happen to him, the agents minimized the risk of jail time by stating that all they knew at the time was that a few pictures had been passed around. Defendant finally asserts that instead of warning him that he may ultimately go to jail, the agents deceived him by telling him that his cooperation would help him and that they were not going to arrest him that day.

In response, the Government contends that Defendant's statements were voluntary. In support, the Government points out that there is no evidence that Defendant was uneducated or lacked intelligence, given that Defendant's responses to the agents' questions indicated an understanding of the nature and purpose of the interview. The Government further points out that the agents repeatedly informed Defendant of his right to leave the residence; did not physically restrain him, brandish weapons, or use force; and only interviewed Defendant for a short time. In addition, the questioning was conducted in Defendant's bedroom at his suggestion, and the agents did not lock or block the door. The Government also contends that even if Defendant was suffering from anxiety or mental illness, Defendant's confession cannot be deemed involuntary without some form of police coercion, which was not present here.

In determining whether a confession is involuntary, courts must take into account the "totality of the circumstances" and whether the police overreached. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Under this analysis, the court must assess both the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Ransfer, 749 F.3d 914, 935 (11th Cir. 2014). In making this assessment, the court considers a multitude of factors including: (1) the accused's level of education or intelligence; (2) the failure to inform the accused of his constitutional rights; (3) the length of detention; (4) the repeated and prolonged nature of the interrogation; and (5) the use of physical punishment, such as the deprivation of food or sleep. Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir.

2003); Waldrop v. Jones, 77 F.3d. 1308, 1316 (11th Cir. 1996).  Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. Connelly, 479 U.S. at 167; United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (opining that sufficiently coercive conduct normally involves "subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.").

Defendant argues his statement was coerced because the agents minimized the risk of jail time by stating that all they knew was that a few pictures had been passed around, that his cooperation would help him, and that they were not going to arrest him that day, instead of warning him that he may ultimately go to jail.  This Court does not agree that Defendant's confession was borne out of coercive conduct by the agents in this case.  While the agents did make vague statements indicating that cooperation could help Defendant, the agents' conduct in raising the possibility of Defendant cooperating does not render Defendant's subsequent statements involuntary.  The Eleventh Circuit has held that a statement is not voluntary if it is obtained by any direct or implied promises, however slight.  United States v. Mercer, 541 F.3d 1070, 1075-76 (11th Cir. 2008).  That being said, where the law enforcement agents have raised the possibility of a cooperation agreement with the suspect or told the suspect that cooperation would probably be helpful, it is not sufficient inducement so as to render an incriminating statement involuntary.  Mercer, 541 F.3d at 1075-76 (opining that an officer's suggestion that a cooperation agreement may be made does not make the defendant's

16

statements involuntary); see also United States v. Deal, 438 F. App'x 807, 811 (11th Cir. 2011) (finding that where a defendant alleged that he felt ill and stated that he had been tricked, a law enforcement agent who stated the "we might be able to straighten some of this out" in response to defendant's assertion of innocence, and who offered defendant an opportunity to write a letter to the prosecutor did not compromise the voluntariness of the defendant's statements); United States v. Graham, 323 F. App'x 793, 800 (11th Cir. 2009) (statement by law enforcement officer to defendant that cooperating would benefit defendant did not support finding that defendant's statements were the product of law enforcement coercion); United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) (holding that agent's statement that while he could not promise anything, if defendant were to cooperate with substantial assistance, the United States Attorney could recommend a shorter sentence was not a sufficient inducement to render a statement involuntary).   Here, the agents encouragement of Defendant falls short of a promise.   Instead of promising Defendant anything, the agents simply explained that they act as "fact finders" to gather all the evidence and present it to the United States Attorney's Office (USAO) and that the USAO would ultimately decide whether to prosecute Defendant.   (Tr. 31, 47; Gov't's Ex. 10 at 32:30-32:50, 33:29-39).

Furthermore, while Defendant focuses on the fact that the agents did not warn him that he would likely be prosecuted, Defendant's statements show that he was already aware of the likelihood that he could be prosecuted for viewing pictures of underage girls.   Indeed, Defendant admitted during the conversation that he knew the pictures he

17

viewed were illegal.  At one point, Defendant even said he could not believe that doing such "stupid sh*t" would cause him to go to jail.  (Gov't's Ex. 10).  Defendant also repeatedly asked the agents whether he was going to jail.  The agents' answers were not deceptive.  The agents told Defendant the only thing they had on him was viewing pictures, that they were acting as factfinders, and that they would provide information to the USAO, which would then determine whether Defendant would be prosecuted.  Under these circumstances, this Court cannot conclude that law enforcement officers engaged in deceptive behavior amounting to coercion.

Defendant also argues the agents were deceptive and that his statements were involuntary because the agents indicated he would not be arrested for possessing images of child pornography and did not tell him that such cases are usually prosecuted.  Defendant relies upon United States v. Lall, 607 F.3d 1277 (11th Cir. 2010), to support his argument that the agents' actions were coercive.  Defendant's reliance on Lall is misplaced.  Indeed, the Eleventh Circuit's holding in Lall is distinguishable from the instant action.  In Lall, a defendant suspected of credit card fraud showed a detective the equipment he used to commit the crime after the detective stated that he would not use this information to prosecute him.  Id. at 1281.  In that case, the twenty-year-old defendant was interviewed in a bedroom and his parents were purposefully excluded from the room.  Id.  Less than twenty-four hours later, the police officer notified Secret Services.  Id.  Several days later, the detective asked the defendant to come to the police station to elaborate on his earlier statements, and the detective told the defendant that

18

he would not need to be accompanied by a lawyer and that the detective "wasn't going to be charging him with any of this." Id.  Eventually, the defendant was arrested and convicted, based in part on the statements made to the detective. Id. at 1282.  The Eleventh Circuit found the defendant's confession was involuntary. Id. at 1287.

The Lall case is fundamentally different from this case as the deceptive or coercive tactics used by the detective in Lall are absent here. First, Defendant mischaracterizes the agents' statements.  Here, unlike in Lall, the agents neither promised Defendant that his statements would not be used against him nor did they deceptively induce Defendant into speaking with them. The agents did not tell Defendant that he would not be arrested or serve jail time in the future, or imply that his confession would result in any specific benefit.  Instead, the agents told Defendant that he would not be going to jail on the day the search warrant was executed, that the agents were only "fact-finders," and that the USAO is ultimately responsible for making a decision about whether to prosecute Defendant.  The agents' statements were accurate and not misleading.

Moreover, the circumstances of this case do not otherwise show coercion.  The agents' interview only lasted thirty-five minutes and the agents remained collegial throughout the interview.  The agents did not use force, threaten Defendant, promise him anything in return for his statements, harm or restrained him, deprive him of food or sleep, or otherwise coerce Defendant into making self-incriminating confessions.  Instead, Defendant voluntarily exited the living room and chose to speak to the agents

19

in his bedroom.  While in Defendant's bedroom, the agents informed Defendant on multiple occasions that he was not under arrest, that he was not under any obligation to speak with them, and that he could stop the interview or refuse to answer questions at any time.  Additionally, the recording of the agent's interview of Defendant reveals that the tone of the interview was conversational and that Defendant was an active and cooperative participant.

Furthermore, this Court does not agree with Defendant that his mental capacity or intelligence rendered his statements involuntary.  Despite the fact that Defendant possessed unusual bedroom decor for a twenty-nine-year-old, was nervous and agitated, and stuttered during the course of the conversation, it appears to this Court that Defendant understood that he was not required to speak to the agents.  It is true that Defendant repeatedly indicated that he knew he had to talk to the agents in response to the agents' statements that Defendant did not have to do so and could leave.  Based on the totality of the exchange between the agents and Defendant, however, this Court concludes that Defendant's statements merely reflected his belief that cooperating with the agents could possibly benefit him.  Similarly, based on the Defendant's ability to understand the entire remainder of the conversation and the agents' clear explanation that Defendant did not have to converse with them, this Court cannot conclude that Defendant did not understand that he did not have to talk to the agents.  Indeed, Defendant was recorded stating in response to the agent's assurances that he did not talk to them, "Well, I do though . . . I understand how stuff works."  (Gov't Ex. 10).

20

Moreover, there is no evidence to suggest that the agents engaged in coercive or misleading behavior that led Defendant to conclude that he had to speak with them. Instead, each time Defendant said he had to speak with the agents, Defendant was informed by the agents that he was not under any obligation to speak with them. Given the agents' credible testimony that Defendant appeared capable of understanding and answering questions without difficulty, this Court cannot conclude that Defendant did not understand the agents when they informed him that he did not have to speak to them. (Tr. 34-35, 44; see generally Gov't's Ex. 10). Defendant's immediate and responsive answers to questions asked of him throughout the recording shows that Defendant understood the agents' questions.[1]

        For the same reasons, this Court does not find that Defendant's intellect was compromised. Indeed, Defendant explained reasonably complicated matters to the agents such as how he utilized search terms on the internet to find pictures of under-aged girls and how he obtained the pictures. When asked whether Defendant understood what the agent meant when the agent said that someone used an IP address from the house to look at pictures of under-aged girls, Defendant said he knew a lot about computers. Defendant's statements also show his knowledge and understanding that under-aged pornography was illegal and that he understood what polygraph test was. Defendant also appeared to anticipate the direction the agents' investigation could

---

[1] The only exception was Defendant's reasonable confusion when one of the agents asked Defendant if he could assume Defendant's identity. As soon as the agent reworded the question to ask if Defendant would allow him to use Defendant's email address, however, Defendant comprehended. (Gov't's Ex. 10).

take by locating the individuals who created the pictures.  In addition, Defendant inquires into the likelihood of his arrest or prosecution demonstrates that he fully comprehended the implications of his voluntary statements.

Moreover, it did not appear that Defendant was particularly impressionable or easily manipulated by the agents.  Defendant easily and without hesitation disagreed with some of the statements the agents made and answered strongly in the negative when the agents' questions suggested further unlawful activity such as the touching under-aged girls.  Also, as noted above, the agents' conduct with Defendant were not coercive. Therefore, under the totality of the circumstances, this Court concludes that Defendant's statements to the agents were voluntarily made.  <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) (finding that defendant, who suffered from depression and was possibly impaired by the use of drugs, voluntarily waived his rights and made statements because law enforcement did not engage in coercive behavior and there was no evidence that the depression and drugs interfered with the defendant's ability to think clearly or understand the charges against him); <u>United States v. Platt</u>, No. 2:06 CR 214-MEF, 2007 WL 1034958, at *6 (M.D. Ala. Mar. 29, 2007) (concluding that where there was no law enforcement coercion and defendant appeared to be lucid and to understand the officers, and the fact that defendant was in a weakened state of mind did not render his statements involuntary); <u>United States v. Stevenson</u>, No. 1:11-CR-350-ODE-RGV, 2012 WL 1418635, at *4 (N.D. Ga. Apr. 23, 2012) (finding that defendant who was not coerced and appeared to understand what rights were at stake voluntarily

waived rights despite possibly suffering from mental illness).  Accordingly, Defendant's Motion to Suppress Statements should be **DENIED**.  Docket Entry [25].

## CONCLUSION

Based on the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**.  Docket Entry [13].  As there are no further motions pending, the undersigned certifies this case ready for trial.  The Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this 25  day of August, 2014

/s/ Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)